Filed 3/3/26  N.L. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| N.L.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>    Respondent;<br><br>SAN MATEO COUNTY HUMAN SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | A175055<br><br>(San Mateo County<br>Super. Ct. Nos. 23JD0577 &<br>23JD0578) |

    N.L. (Mother) petitions this court for extraordinary writ review of a juvenile court order terminating her reunification services and setting a selection and implementation hearing for two of her children, now 16-year-old Ne.L. and 15-year-old No.L.  We deny the petition.

## BACKGROUND[1]

*Proceedings Leading to Detention*

    These dependency proceedings began in July 2023, after the Santa Cruz Human Services Department (Santa Cruz Department or Department)

---

[1] We incorporate by reference facts from a prior unpublished opinion, *In re Ne.L.* (Dec. 11, 2024, H052009) [nonpub. opn.].

filed Welfare and Institutions Code section 300 petitions[2] as to Mother's two children, then 12-year-old No.L. and 13-year-old Ne.L.[3] The Department indicated it had received seven prior referrals in reporting safety concerns. The petitions alleged the children have "suffered, or were at substantial risk of suffering, serious physical harm or illness due to Mother's failure or inability to supervise or protect them, and Mother's inability to provide regular care for the children due to mental illness or substance abuse." (*In re Ne.L., supra,* H052009.) Additionally, the petition alleged Mother's mental health issues put Ne.L. at "risk of serious emotional damage." (*Ibid.*) At that time, the Department did not remove the children but instead recommended a psychological evaluation and offered family maintenance services. (*Ibid.*)

"[W]hile the petitions were pending and before the contested hearing, Mother and Ne.L. were involved in a physical altercation in a hotel room where the family had been staying. When law enforcement officers arrived at the scene, they observed bruising under Ne.L.'s left eye, redness to her face, and a bump on her forehead, which Ne.L. stated was caused when Mother struck her." "Based on interviews with Mother and the children, the family had been staying at the hotel because Mother believed their home was infested with termites. The two older children claimed the night before the incident, Mother left all three children in the hotel room to spend time with an unidentified male in another room at the hotel. Mother did not return

---

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] A petition was also filed as to Mother's third child, then eight-year-old Na.L. However, he was returned during the course of the instant proceedings, and his case was dismissed. He is not a party to this appeal. Additionally, all three children have different fathers, and none are parties to this appeal.

until the next morning as the children were getting ready for school." (*In re Ne.L., supra*, H052009.)

Mother's and Ne.L.'s reports of the incident differed. Ne.L. stated when Mother returned, she became "angry that Ne.L. was still unprepared for school." Mother took Ne.L.'s makeup from the bathroom counter and threw it at her. Officers observed Ne.L.'s body covered in what appeared to be makeup. At some point, Mother took Ne.L.'s cell phone, grabbed Ne.L.'s hair, pulled her to the ground, and "the two wrestled on the ground of the hotel room." Mother stated, she "believed Ne.L. intentionally caused the delay so Mother would be late for her court appearance." When she went to the bathroom to take Ne.L.'s cellphone, she "accidentally struck Ne.L. on the shoulder," and when she tried to take Ne.L.'s makeup away, it was Ne.L. who "grabbed Mother's hair, hit her, and tried to suffocate her." Mother denied hitting Ne.L., rather she "only attempted to shield herself from her daughter's assault." (*In re Ne.L., supra*, H052009.)

Upon her arrest for child cruelty of Ne.L. and for child endangerment of No.L. and Na.L., officers found methamphetamine in Mother's purse. The children were detained. (*In re Ne.L., supra*, H052009.)

In February 2024, the Department filed a fourth amended section 300 petition[4] as to then 13-year-old No.L. and 14-year-old Ne.L. The petitions alleged the children had suffered or were at substantial risk of suffering serious physical harm by Mother's inability to supervise, protect, or provide regular care due to her mental illness, developmental disability, or substance abuse (§ 300, subd. (b)). In support of the subdivision (b) allegation, the

---

[4] The intervening petitions all varied slightly but focused on Mother's mental health and accompanying behaviors, which resulted in an inability of Mother to supervise, protect, or provide regular care for the children and created a substantial risk of harm.

Department alleged Mother suffered from an untreated mental disorder that includes delusions, disorganized thoughts and speech, that Na.L. had missed over 30 days of school over a three-month period, and when questioned by school staff, Mother "yelled and became nonsensical," and upon Mother's arrest for battery of Ne.L., she stated the arrest and the Department's investigation "are part of a conspiracy involving 'abuse for money' " (count b-1); in June 2023, Mother claimed the children had poisoned her and called the police to report them (count b-2); in December 2023, Mother's "use of physical discipline through excessive force" of Ne.L. placed the children at substantial risk (count b-3); and upon her arrest, law enforcement found "1.5 grams of methamphetamine in her possession" and maternal grandmother reported Mother had "used methamphetamines 'since she was a teenager' " (count b-4).

At the contested jurisdiction and disposition hearing, the Department reported Mother had not participated in the recommended case plan, declining to undergo a psychological evaluation, an assessment for substance use, or undergo random drug testing. "The Department noted that since their physical altercation, Ne.L. had declined visits with Mother, but visits with No.L. and Na.L. were successful. . . . Since Na.L.'s removal from Mother, Grandmother reported that he was doing better than expected, but missed Mother." (*In re Ne.L., supra*, H052009.)

The juvenile court found all three children came within the jurisdiction of the court, found the allegations in the amended petition to be true, except the allegation that Mother believed the children poisoned her (count b-2), which the court struck, found by clear and convincing evidence return of the children to Mother would be detrimental, and ordered continued visitation,

4

reunification services for Mother, and the parties' participation in the recommended case plan. (*In re Ne.L., supra*, H052009.)[5]

*Transfer Proceedings and Six-and 12-Month Review Hearings*

In the meantime, Mother had moved out of Santa Cruz County. On December 10, the Santa Cruz juvenile court held a transfer-out hearing and a belated six-month review hearing. The court found reasonable services had been provided and Mother's progress had been "minimal" and set the matter for a 12-month review hearing on January 30, 2025. Additionally, the court found neither Mother nor the children lived in Santa Cruz County and granted the motion to transfer to San Mateo County. A transfer-in hearing was scheduled for December 23[6] and a confirmation of transfer hearing was set for December 26, both in San Mateo. At the December 26 hearing, the court stated the matter would "be sent immediately to San Mateo" with a hearing set for January 6, 2025. At the January 6 hearing, although San Mateo had accepted the transfer from Santa Cruz, the court immediately set the matter for a contested hearing regarding a motion to transfer-out back to Santa Cruz.

In its brief in support of its motion to transfer-out, the San Mateo County Human Services Agency (San Mateo Agency or Agency) explained it recommended a transfer back to Santa Cruz so the court could conduct the 12-month status review hearing, which was about one month away. The

---

[5] On appeal, Mother challenged only the court's finding that clear and convincing evidence supported Na.L.'s removal. The Court of Appeal issued an opinion on December 11, 2024, affirming the juvenile court's order. (*In re Ne.L.*, *supra*, H052009.)

[6] This hearing was not held because San Mateo County did not receive the court file from Santa Cruz County and only learned of the hearing when Mother showed up to court.

Agency, citing the California Rules of Court, Welfare and Institutions Code, and the County Welfare Directors Inter-County Transfer Protocol, contended the children's best interest would be better served by having the Santa Cruz Department and the Santa Cruz juvenile court make recommendations and orders as they were at that point more familiar with the file and there was not sufficient time for the San Mateo Agency to properly assess the family and make recommendations for reunification and continued services or termination of services.

The Santa Cruz juvenile court was aware of the potential return of the dependency case. At a January 9 hearing, the court stated, "The Court was made aware that San Mateo County was probably going to be sending the matter back to Santa Cruz. The Court was confused as to why that would happen due to the mother and all her children not residing in this county." However, the court reached out to "the judge in San Mateo County, and it was explained that a contested hearing was scheduled" for January 13. Accordingly, "Referrals are still open in Santa Cruz County and will continue to be open until the outcome is determined in San Mateo. Social Worker Strutz continues to meet with the children and is still managing the case."

On January 14, the San Mateo juvenile court transferred the case to Santa Cruz County, indicating San Mateo would accept the case back after the 12-month review hearing.[7] Just prior to the review hearing, the Santa Cruz Department moved to transfer the case back to San Mateo County. The Santa Cruz court held the 12-month review hearing and a hearing on the Department's transfer motion on January 30. The court found by clear and

---

[7] Mother appealed from the order transferring the case back to Santa Cruz, and we dismissed the case as moot. (*In re Ne.L.* (Feb. 19, 2026, A172290) [nonpub. opn.].)

convincing evidence reasonable services had been provided, continued reunification services, and granted the request to transfer back to San Mateo County. The court set the 18-month review hearing date for June 2025. San Mateo County duly accepted the transfer on February 5, set an April interim hearing date, and maintained the June 18-month review hearing date.

*Proceedings Leading to 18-and 24-Month Review Hearings*

In its April 2025 interim report, the San Mateo Agency stated Mother lived in San Bruno and worked "providing spiritual guidance as an intuitive," and she had been ordered to engage in mental health services and an approved parenting program, among other things. On February 11, Mother had reported she had e-mailed a certificate of completion of such program. On February 21, the social worker provided Mother "with a service letter in which she was referred to Parent Project and other services." The social worker noted the Agency had received a copy of Mother's enrollment in "Parent Education and Family Stabilization Course . . . ; however, we received notification from Santa Cruz Department that they have not approved. In order for the Agency to determine if this parenting course is sufficient, we need you to sign a release so we can communicate with this provider." In the meantime, the Agency referred Mother to Parent Project, which was an Agency-approved program.

On March 24, Mother provided a certificate of completion for a 12-hour online parenting class. The next day, the social worker advised Mother that the Santa Cruz Department had not approved or disapproved of her engagement in that parenting class, as "it is not a program they utilize and they did not do any research to learn more about it." Mother was encouraged to follow up with her previous referral to Triple P, Parent Project. In the meantime, the San Mateo Agency received a response from the online

7

parenting class, which reported the program was "self-paced" and the representative "could not report anything about the mother's progress in the course or any insight or understanding she might have developed." When the social worker followed up with Mother to inquire "what insight she had gained" from the online course, Mother stated, "she did not want 'to get into it' and agreed to engage in Triple P services through the Agency."

The Agency interviewed Ne.L. and No.L. Ne.L. expressed not wanting visitation with Mother and then recalled some of Mother's prior behavior, which included leaving her and her siblings alone at night in the hotel room "with an unknown man," the physical altercation between her and Mother in December, Mother smoking marijuana in front of the children, Mother often yelling at her, " 'ma[king] up stories in her head,' such as seeing bugs that were not there, saying she was being scammed by people, and also reporting she was dating celebrities." Most recently, Mother would refuse to leave maternal grandmother's home until the police were called. Ne.L. reported Mother's behaviors caused her to not "want to rebuild a relationship with the mother."

No.L. described Mother as a " 'liar' who makes up stories and sees things that are not there" like saying she was dating celebrities or making them "move out of their home due to the mother believing she was seeing bugs that were not there." Before No.L. was diagnosed with Autism, Mother and No.L.'s father "could not handle" her behaviors and "would 'whoop' h[er] with a belt, hanger and extension cord." No.L. also reported her parents were "having difficulty accepting [her] gender identity." No.L. did not wish to reunify with Mother but she "did feel comfortable with continued supervised visits."

8

Both children were in weekly therapy, and No.L. was also receiving services to help with her Autism diagnosis. At the interim review hearing, the court maintained all prior orders.

In its 18-month review report, the Agency recommended the court terminate reunification services as to Ne.L. and No.L. and return Na.L. to Mother with family maintenance services. No.L. and Ne.L. did not wish to reunify with Mother nor did they wish to live with her. When explaining her refusal, No.L. stated when she lived with Mother, she "had no friends or stability, as they moved around a lot," and that she "did not feel safe with the mother because she was someone who could not be trusted." Additionally, No.L. did not feel "comfortable around h[er] mother" because when she told Mother she was " 'trans,' " Mother began telling bible stories, which made No.L. "feel bad." Finally, at No.L.'s graduation, Mother had left the ceremony to go get Na.L., despite knowing she was not supposed to do so, and No.L. stated her "trust" with Mother had "wavered as a result." No.L. expressed a desire to be adopted by maternal grandmother.

Ne.L. "emphasized that she did not want to reunify with the mother because she did not feel like anything has changed. Without a hesitation [Ne.L.] identified adoption as her permanency plan," stating it "was an easy decision for her because she did not want to ever return to the mother's care." She felt "safe" at maternal grandmother's home and noted Mother "was never able to offer her this type of support." Additionally, during the reporting period, Ne.L. continued to decline visits with Mother. As of May, both children remained in individual therapy, but Ne.L.'s therapist had sent the Agency notification Ne.L. would be "discharged," as she was "feeling overwhelmed with appointments." The social worker suggested decreasing therapy to every other week, but Ne.L. preferred to "stop it for now."

9

At the June 2025 18-month review hearing, Mother's counsel requested a contested hearing as to No.L. and Ne.L., but she was "prepared to move forward" with the recommendation for Na.L.  The court ordered Na.L. returned to Mother's care, set a family maintenance review hearing as to him, and continued the case to the end of July.

Mother moved to extend services to the 24-month review date as to No.L. and Ne.L.  She maintained the repeated transfer of her case between Santa Cruz and San Mateo counties prevented her from completing her case plan.  Specifically, Mother contended that during these transfer periods—from December 10, 2024 to February 5, 2025—she lacked "a consistent social worker and lacked consistent access to her court ordered services."  And once her case settled in San Mateo, "she continued to lose an additional two months of reunification time as San Mateo County struggled to put referrals into place."  Mother argued that with an additional six months of services—"to engage in individual therapy and continue to implement the valuable skills she learned at the Parent Project"—reunification between herself and No.L. "would be very likely" and reunification between herself and Ne.L. "would be likely."  Finally, Mother claimed there was "no evidence" the Agency encouraged the children to visit.

The Agency opposed additional services.  The Agency noted that when the Santa Cruz Department signed the transfer out order on December 10, 2024, triggering the transfer-in hearing on December 23, they did not send the file, and the hearing did not get calendared.  And until the transfer hearing occurs and the in-coming court accepts the case, the prior county "still 'owns' " the case and must provide services.  So, despite the delay in settling in San Mateo, Mother and the children still had an assigned social worker and counsel.  Moreover, by the January 13 contested hearing date,

10

only 18 days had remained until the 12-month review hearing, leaving the Agency "very little time to evaluate the case and make a recommendation." The matter was thus "very briefly returned to Santa Cruz," for the review hearing. At that January 30 hearing, Mother was offered six additional months of services. The case was back in San Mateo on February 5. Thus, the Agency maintained services had been provided and were reasonable. Mother had repeatedly been offered visitation, and the fact 15-year-old Ne.L. and 14-year-old No.L. had not wanted to visit Mother did not make the offer of services unreasonable. Mother, herself, "delayed parenting classes until the case was transferred to San Mateo County," previously taking an online self-directed class that was not an approved program. The Agency, thus, also maintained there was clear and convincing evidence there was no substantial probability of return of Ne.L. and No.L. and that an extension of services to 24 months was not in their best interest. Although No.L. would "sporadically" visit Mother, it was in neither child's best interest to reunify with Mother.

In its July and August addendum reports, the Agency's recommendations remained the same–termination of services and setting a section 366.26 hearing. Both children continued to decline visits and "to report negative emotional impact as a result of their mother's behaviors."

The social worker described the past three monthly visits with the children. In June, Ne.L. "felt frustrated" by the court's decision to return Na.L., as she feared "for her brother's emotional safety and stability in their mother's care." When the social worker inquired about family therapy, Ne.L. stated "she was 'done trying,' " and Ne.L. tearfully recalled just last week Mother had dropped off Na.L. and "began a fight with her and her grandmother." Mother pointed at Ne.L., blaming her as "the reason she went to jail" and that she was reason "all her siblings are separated." Ne.L. "began

11

to sob and said that her mother behaved in the same manner as she did back in December 2023." The social worker shared efforts Mother had made and reflections from therapy, Ne.L. stated she was "done with therapy" and denied engaging in self-harm or having suicidal ideation.

No.L. had stopped "joining the visits" with Mother. When asked about her past statements where she expressed interest in going to visitation again, No.L. explained after an incident involving Mother at her graduation, she "no longer want[ed] to associate" with Mother. No.L. added Mother "is a 'very toxic individual who fights with everyone.' " The social worker shared the positive words Mother had for No.L., but No.L. shook her head and said, " 'just no. It's not happening.' " The social worker asked about family therapy, No.L. replied, "even with family therapy, they would 'not engage as this chapter has been closed.' "

The following month, Ne.L. had "emphasized that she never wants to see her mother" and wanted to be adopted by maternal grandmother. No.L. did "not want to see or have any visits with their mother" and felt "there is no point for a visit with her."

In August, Ne.L. again expressed concern over Na.L. for whom she felt she was " 'a second parent.' " Ne.L. remained "in the same position" about visitation and adoption. No.L. emphasized maternal grandmother's home remained " 'home' and 'it has always been the safe place,' " and she did not "have any plans" to visit Mother.

In contrast, Mother claimed Ne.L. and No.L. "have been visiting with her" and that she "feels upset that her mother (maternal grandmother) and her older children are lying about the lack of visitations."

The hearing was then continued to August 13. The social worker testified she first contacted Mother on February 12. When her case was

transferred, Mother inquired if her parenting education class would meet her court-ordered case plan. In March, Santa Cruz informed San Mateo that as the course was "only a self-paced program" they would neither "approve or disapprove of her engagement," and San Mateo encouraged Mother to participate in the previously referred Triple P parenting classes. Mother finally enrolled in Triple P, and reported "she noticed an improvement in her relationship with her two older children as she implemented the newly developed parenting skills she was learning in the Triple P." However, the social worker testified Ne.L. consistently, throughout the course of the proceedings, refused to go to any visitation with Mother. Additionally, although at the beginning of the proceedings No.L. had "gone back and forth" over visitation, since the end of May, she "no longer wanted to engage with mom."

To "encourage" visitation, the social worker continued to ask the children monthly about visitation and reunification, let them know Mother "loves them very much and she is working so much on her case and really wants to repair the relationship," and informed them of "all the positive statements their Mother has shared." The children denied Mother's claims that there had been visitation, but rather told the social worker Mother drops off Na.L. at maternal grandmother's house where they are staying. According to Ne.L., at these handoffs, Mother continued "to fight everyone in the family." During the last handoff, an "emotionally distraught" Ne.L. stated Mother blamed her as the reason Mother had gone to jail and as the reasons the siblings were separated and stated she was not her Mother.

After the social worker's testimony, the court continued the hearing to October and also set a December date for the 24-month review hearing. The court ordered services to continue until the 18-month review hearing was

13

completed or until they reached the 24-month review mark. Additionally, the court ordered the Agency to make family therapy referrals but noted it "may be an exercise in futility," as "they can do that and then we'll continue to encourage the children to participate" in therapy and visitation but noted the children were soon to be 16 and 15 years old, and the Agency was not "going to force the children" to attend.

In its October addendum report,[8] the Agency continued to recommend termination of services. The Agency opined the children's relationship with Mother would "require many years to heal and that adding any more pressure for reunification with their mother when they have repeatedly voiced their oppositions will be detrimental to their mental health, emotional well-being and their already strained relation with their mother." The social worker submitted a referral for therapeutic visits and family therapy between Mother and the children in August 2025, and a clinician was assigned to make an assessment. The clinician stated both children remained " 'resolute in their decision to decline family therapy at this time, citing significant emotional distress related to the idea of participating. One youth expressed that if they were forced to participate . . . , they would kill themselves. . . . [¶] The other youth shared that they had previously participated in family therapy with their mother, but ultimately did not find the experience helpful. Specifically, the youth reported their mother engaged in blaming behaviors during and after sessions.' " (Italics omitted.) Thus, while family therapy and therapeutic visitation was a long-term goal, it was

---

[8] The Agency also included over 160 pages of the delivered service log of all contacts, services, and visits between December 1, 2023, to September 23, 2025.

not recommended at this time because of the children's " 'strong objections and potential impact on their emotional well-being.' " (Italics omitted.)

The social worker continued to ask the children about visitation and therapy. In September, Ne.L. stated Mother had told them they would soon begin therapeutic visits and have family therapy. However, Ne.L. stated she would refuse to go, having found it unsuccessful in the past. Ne.L. "shared that the emotional and mental abuse has affected her so much, that in the past she wanted to kill herself." When the social worker asked No.L. about reunifying or staying with Mother, No.L. stated " 'I would much rather drink a bottle of cyanide and bleach than go back to my mother.' " She denied having current suicidal thoughts but explained, "it was only a feeling if she were to move back home." No.L. also shared a therapist had called her in September asking if she would like to do family therapy with Mother, but she declined.

While Mother's therapist recommended family therapy between Mother and Na.L., he could not "fully recommend" it for the older children because in order for family therapy to work, it requires all parties to be ready and willing to participate.

At the October hearing date, the court continued the hearing as Mother's counsel was ill. The court stated, "it appears that the 18-Month Review and the 24-Month Review are going to be merging." Accordingly, the court set a combined 18-month and 24-month review hearing for December 2025.

At the December hearing, the social worker retook the stand. Since the last court day, Mother's second oldest child, No.L. expressed she was open to having unsupervised visits but she did not want to be forced to do so.[9]

_____

[9] The parties waived a 24-month review report.

15

Mother had completed her parenting classes and expressed "she really got a lot out" of them and had been "attempting to implement the skills she learned in that parenting class in her visitations." Mother had consistently engaged in individual therapy. Although the Agency had made the referral for family therapy with Mother and Ne.L., Ne.L. was "not ready to engage in family therapy."

The court then heard from counsel.

Mother's counsel argued it would be appropriate to return Ne.L. and No.L. to Mother, because counsel did not "believe the Court can make the requisite findings of detriment" to keep the children out of Mother's care. Counsel stated Mother had been successfully reunified with Na.L., and that case had been dismissed; Mother had completed "everything that she can possibly complete"; "in terms of physical safety," counsel did not "see that there is a risk to the children"; and in "terms of emotional safety," Mother recognized the children do not want to return to her, so counsel proposed a "soft return," whereby Mother would allow the children to continue to reside with maternal grandmother "until and unless either child was ready and willing to come home." Counsel suggested a "soft return" would protect the children's physical and emotional well-being while "also protecting the legal rights of mother and not making a detriment finding and termination-of-services finding."

County counsel argued it would be detrimental to the children's mental health and emotional well-being to be returned to Mother. Ne.L., in the past, had attempted to go to family therapy and do therapeutic visitation with Mother and it was not successful. In the past, the children have expressed they would kill themselves if returned to Mother. Counsel further argued reasonable services had been provided. Specifically, Mother had been

16

previously offered the Triple P parenting program in Santa Cruz County but had never enrolled. Additionally, although Mother complained there had not been therapeutic visitation or family therapy, the psychiatric social worker opined "it would be emotionally detrimental to both children to do that." The Agency had "tried to make the visits happen," and while there had been some movement regarding No.L.'s willingness to visit, Ne.L. had been consistent that she did not want to visit do so. Finally, counsel noted there was "no such thing as a soft return," and despite her words to the contrary, under such a premise, Mother could, at any time, decide to take the children out of maternal grandmother's care.

No.L.'s counsel stated the "soft return" counsel spoke of was not something she had ever seen before, but in any event, it would be "very emotionally dysregulating for both children." Nor did counsel "see any even remote way that that could be in their best interest and meet their specific emotional needs at this time."

Ne.L.'s counsel joined with the Agency. Counsel also stated Ne.L. "wants the Court to know that she has been asked many, many times about visits and about family therapy and she has been resolute. So the Agency has made efforts to convince her. Multiple people have talked to her trying to convince her and she is very certain."

Mother also spoke, although she did not testify. She stated she had moved out of Santa Cruz because she "was looked at in a very discriminatory way," her character had been "assassinated," and things had been "unfairly judged" and reported in that county, and since moving to San Mateo she had been able "to heal from such treacherous circumstances." She stressed she did not think the court "really understands" how well Ne.L. knew the legal

17

system, and that she had been influenced by paternal aunt, who is a judge, and maternal grandmother.

The court reviewed and considered all of the reports, the motion and opposition to extend services to the 24-month mark, and considered the social worker's testimony, which the court found to be credible.

The court found by clear and convincing evidence there was no substantial probability of return and that an extension of services was not in the children's best interest. Although Mother asserted the Agency had not provided reasonable services, the "pages of Services Delivery Logs provided to mother's attorney . . . tells a different story concerning the issue of reasonable services. Specifically, the Court notes that the Agency made robust efforts to facilitate mother's visits with [Ne.L.] and [No.L.] The Agency did not approve or disprove [*sic*] of mother's 12-hour self-based [*sic*] parenting course as it was not a program utilized by San Mateo County. When the social worker asked mother about what she had learned from the course and how she could apply it to her children, she said she did not want to get into it and agreed to engage in Triple P services through the Agency. [¶] The fact that [Ne.L.] and [No.L.] do not want to visit with mother does not make the offer of services unreasonable. The older children are currently 15 and 16 and they each have a voice and they decline to visit with mother." Mother received services from both Santa Cruz and San Mateo counties and "nothing about the transfer proceedings in the case makes this an extraordinary circumstance case warranting an additional six months of services," notwithstanding the fact that they were already at the 24-month mark, and the circumstances "do not exist in this case" to continue services beyond the 24-month mark. With respect to detriment, the court pointed to the assessment by the clinician regarding No.L.'s suicidal statements if made to participate in family therapy

or therapeutic visits and Ne.L.'s statements that Mother's behavior "affected her so much in the past that she wanted to kill herself." The court found "substantial risk of detriment with return of the children to mother is abundantly clear based on all of the records before the Court."

The court terminated services and ordered a section 366.26 hearing be set.

## DISCUSSION

"California has a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.)

At both the 18-month and 24-month review hearings, the juvenile court "shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§§ 366.22, subd. (a)(1), 366.25, subd. (a)(1).) In making the detriment determination, the court must consider "the social worker's report and recommendations" and "the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which they have availed themselves of services provided." (*Ibid.*) The burden of establishing detriment is on the social worker. (*Ibid.*)

If the court concludes the child should not be returned to the parent, it must schedule a hearing to select a permanent plan under section 366.26

19

unless "the court finds by clear and convincing evidence . . . that there is a compelling reason . . . for determining that a hearing held under Section 366.26 is not in the best interests of the child because the child is not a proper subject for adoption and has no one willing to accept legal guardianship as of the hearing date." (§§ 366.22, subd. (a)(3), 366.25, subd. (a)(3).) "The court shall also order termination of reunification services to the parent" and "determined by clear and convincing evidence whether reasonable services have been offered or provided to the parent." (*Ibid.*) If at the 18-month review hearing, the court "determines by clear and convincing evidence that the best interests of the child would be met by the provision of additional reunification services," the court may continue the hearing for up to six months. (§ 366.22, subd. (b)(1).) Under those circumstances, the review hearing "shall occur within 24 months of the date the child was originally taken from the physical custody of their parent." (*Ibid.*)

We review the juvenile court's finding of detriment and its order terminating reunification services for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401 (*Yvonne W.*); *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.) In so doing, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re A.M.* (2020) 47 Cal.App.5th 303, 314, disapproved on other grounds as stated in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18.) The appellant bears the

20

burden of showing a finding or order is not supported by substantial evidence. (*In re L.Y.L.,* at p. 947.)

### *Detriment*

"The standard for showing detriment is a 'fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*Yvonne W., supra*, 165 Cal.App.4th at p. 1400.) "In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Ibid.*)

Mother contends "substantial evidence did not exist for the court to deny return" of Ne.L. and No.L. to her care. Mother points out she "had already made such substantial progress in her case plan," and that Na.L. was returned to her care and that case had been dismissed. The dismissal occurred "a mere 6 days before services were terminated" and the section 366.26 hearing was set as to Ne.L. and No.L. Mother further asserts her relationship with No.L. "had improved so substantially" that all the parties "agreed that visitation between mother and [No.L.] should be unsupervised and could include overnight visitations. [¶] . . . With such progress being made, the requisite finding that it would be detrimental to return [No.L.] to h[er] mother's care could not be made. . . ." Mother also claims she completed all of her court ordered reunification services with the exception of family therapy, which was "no fault" of hers. Finally, Mother

21

had expressed she would "allow the children to continue to reside" with maternal grandmother, and such a " 'soft' return would meet everyone's needs—the mother could avoid a termination of services order, [No.L.] and [Ne.L.] could remain with grandmother, and the court wouldn't have to make unsupported detriment findings."

While it is true Mother completed her reunification plan—notwithstanding family therapy and visitation—that does not mean there would be no detriment in returning the children to her care. Indeed, both children expressed suicidal thoughts when the social worker mentioned reunifying with Mother. Additionally, although Mother's counsel suggested a "soft return," counsel acknowledged that idea was of her own making and no such plan existed. Further, as the Agency observed, Mother could change her mind at any time. The fact remains, and as the juvenile court determined, "substantial risk of detriment with the return of the children to mother is abundantly clear." Ne.L. consistently declined visits and told the "the social worker that the emotional and mental abuse has affected her so much in the past that she wanted to kill herself," and No.L. stated "she would rather drink a bottle of cyanide and bleach than go back to my mother."

Mother acknowledges the court's statements but contends No.L.'s statement was only made in relation to family therapy, not as to return to Mother, and it was made four months prior to the detriment finding. Ne.L.'s statements, Mother contends, were that " 'in the past' she wanted to kill herself," and that a "minor's resistance to reunify with a parent is not in itself a sufficient basis for a court to deny reunification."

The record here is one of more than mere resistance. Both children repeatedly stated they did not wish to reunify with Mother and both children expressed suicidal notions if they were to be returned to Mother, with No.L.

22

expressing less than three months prior that she would "rather drink a bottle of cyanide and bleach" than return to Mother.  No.L. went on to state it "would be worse for their mental and emotional health to go back to their parents."  By the time of the combined 18/24-month review hearing, Ne.L. had not visited Mother and consistently refused to do so, and although No.L. had recently decided she was open to visitation again, that is a far cry from return to Mother's care.  In sum, we have no doubt Mother loves her children, and that she made strides toward overcoming the issues that led to dependency, but as of the combined 18/24-month review hearing, substantial evidence showed there remained a serious risk that returning the children to Mother would endanger their physical and emotional well-being.

### *Reasonable Services*

"Family reunification services play a critical role in dependency proceedings" and must be "tailored to the particular needs of the family." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425 (*Tracy J.*).) "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Id.* at p. 1426.)

"Visitation is an essential component of a reunification plan.  [Citation.] To promote reunification, visitation must be as frequent as possible, consistent with the well-being of the child." (*Tracy J., supra*, 202 Cal.App.4th

23

at p. 1426.)  However, when fashioning a visitation order "the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' " (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.)  "This includes the 'possibility of adverse psychological consequences of an unwanted visit between [parent] and child.' " (*Ibid.*)

Mother contends the court's finding of reasonable services was not supported by substantial evidence, and at the 18-month mark, if the court erred in finding reasonable services had been provided, the court was "obligated to provide 6 additional months of services."  Mother maintains the fact the case had reached the 24-month mark is irrelevant—even though the 18-month findings were not made until the 24-month mark, "the remedy to a no reasonable service finding . . . would be a mandatory 6 month continuance.  Alternatively, Mother claims if this court concludes the Agency did not provide reasonable services, but that the 18-month standard mandating additional services is not applicable because 24 months of services "had already elapsed," then the juvenile court erred in not extending services past the 24-month mark.

Mother complains the transfers between Santa Cruz and San Mateo counties interfered with services—"a total of 65 days were lost of consistent reunification services being offered while the family's case bounced between counties." (Italics & boldface omitted.)  Further, she assertedly lost "an additional two months of reunification time as San Mateo County struggled to put referrals into place for Mother's court ordered services," specifically for individual therapy and parenting education classes through Triple P.

24

However, the record shows that until a transferee county accepts a transfer, services continue in the originating county. Thus, although San Mateo briefly accepted transfer of the case, it immediately transferred the case back to Santa Cruz. The Santa Cruz juvenile court was aware of the transfer and ordered that services continue. Mother, herself, confirmed from "November 2024 to February 2025, she engaged in therapy by phone." When the San Mateo Agency received the case, the social worker, on February 21, provided Mother with the access line for services as well as the Kaiser access line because that was the insurance Mother had. After Mother expressed having difficulty getting Kaiser approval, the social worker on March 21, offered to help get her connected, but at that time Mother "was already connected with Kaiser Permanente."

In regard to parenting classes, Mother was repeatedly offered Triple P parenting classes. The Santa Cruz Department first offered Triple P parenting classes in May 2024, and Mother stated she would " 'look into it.' " In November 2024, the Department again encouraged Mother to take parenting classes through Triple P. She again did not do so. Upon transfer of the case to San Mateo, the social worker sent Mother a letter referring her to Triple P classes in February. Mother did not enroll. Instead, she sought approval of an online self-paced parenting education program she enrolled in before the case was initially transferred to San Mateo and which she said was approved by Santa Cruz. However, it was not. When the San Mateo Agency received notification from Santa Cruz the class was, in fact, neither approved nor disapproved, the Agency again referred Mother to Triple P. (It is also unclear how Santa Mateo could have approved the online program as, when San Mateo sought information about it, the representative could "not report anything about the mother's progress in the course or any insight or

25

understanding [Mother] might have developed," and when San Mateo followed up with Mother she stated "she did not want 'to get into it.' " That mother was repeatedly offered the Triple P parenting classes but followed up and then took an unapproved online parenting class does not mean reasonable services were not provided.

Mother claims that had she had parenting classes two months earlier, she could have made more progress towards reunification with the children. However, even assuming Mother had started the Triple P parenting classes two months earlier, which she could have done, there is simply no evidence to suggest she would have made more progress toward reunification. Although Mother contends the classes "led to a noticeable improvement in her relationship with them," the children's relationship with her remained consistent throughout the proceedings, with Ne.L. refusing all visitation and No.L. sometimes refusing visitation and sometimes stating she was willing to go to supervised visitation.

Mother also complains the Agency failed to make a timely referral to family therapy for her and Ne.L. Mother describes this as a "fatal flaw in reasonable services being offered," because had they had family therapy, "it is likely that it could have led to successful visitation and reunification." But the record shows, as the trial court found, a family therapy referral in this case was an "exercise in futility." Neither child was willing or ready to attend family therapy. Indeed, the psychiatric clinician opined, "While Family Therapy and Therapeutic Visitation may be a long-term goal, it is not clinically recommended at this time, due to the youth's strong objections and potential impact on their emotional well-being."

Finally, Mother complains the Agency failed to offer reasonable visitation. Here, she maintains simply asking the children if they were

26

willing to visit was not enough, and the record contains no evidence the Agency "made any attempt to encourage or incentivize" visitation.

That is far from the case. The social worker documented monthly meetings with the children where they were repeatedly asked about visitation. Ne.L. remained resolute in her refusal to visit, while No.L. sometimes vacillated. When the children refused visitation, the social worker probed further asking why they did not want to visit, she also told the children the positive things Mother said about them. For example, when the social worker asked No.L. why he did not want visitation with Mother given her past statement "expressing interest" in visitation, she explained after an incident at her graduation, she decided she "no longer wanted to associate with their Mother." When No.L. told the social worker Mother should " 'just stop trying because it will never work,' " the social worker asked her for her reasons and then shared Mother's positive statements. No.L. stated, " 'just no. It's not happening.' " Yet, the social worker persisted in asking about family therapy. No.L. replied "they would 'not engage as this chapter has been closed.' " Similarly, after Ne.L. after again refused visitation, the social worker reiterated "family therapy was an option to repair their bond." But Ne.L. "shook her head and said she was 'done trying,' " relaying how just the prior week Mother had dropped off Na.L. and began blaming Ne.L. as the reason she had been in jail and the reason the siblings were separated.

Mother compares her case to *In re Alvin R.* (2003) 108 Cal.App.4th 962. There, the minor refused visitation, and the court and the social worker agreed conjoint therapy was a necessary predecessor to visitation and individual therapy a necessary predecessor to conjoint therapy. (*Id.* at pp. 972–973.) However, in that case, the Department made no effort to get the minor into individual therapy, despite the court ordering it to assist the

maternal grandmother in enrolling him in counseling. (*Id.* at pp. 967–968.) The Department did not address the matter in its interim report, the social worker did not address the matter at the hearing, and counsel for the Department represented the reason for the lack of individual therapy was that the maternal grandmother, with whom the minor was placed, had scheduling problems, felt overwhelmed, had insisted upon a therapist close to home, and did not get around to signing the minor up for a long time. (*Id.* at p. 972.) The Court of Appeal determined this was not sufficient to support a finding reasonable services had been provided. (*Ibid.*)

The record here is markedly different. The trial court ordered visitation, the social workers repeatedly encouraged the children to attend, the children were offered individual therapy, the clinician opined forcing visitation was not recommended in the face of the children's "strong objections and potential impact on their emotional well-being," and Mother herself did not wish the children to be forced to visit. (Italics omitted.)

In sum, for all the reasons we have discussed, we conclude the record amply supports the trial court's finding that the Agency provided Mother with reasonable services.

## DISPOSITION

The petition for extraordinary writ is denied. (See § 366.26, subd. (*l*); *In re Julie S.* (1996) 48 Cal.App.4th 988, 990–991.) We deny the request for stay, and our decision is final immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b).)

28

_____

Banke, Acting P. J.

We concur:

_____

Langhorne Wilson, J.

_____

Smiley, J.

A175055, N.L. v. Superior Court